IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ANGIE PAGE,
      Plaintiff,

vs.                           Case No.: 3:18cv302/EMT

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 12, 16). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I. PROCEDURAL HISTORY

On March 11, 2015, Plaintiff filed an application for DIB, and in the application she alleged disability beginning October 22, 2014, but she later amended the onset date to April 3, 2015 (tr. 11).[1] Her application was denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on February 22, 2017, and on March 31, 2017, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 11–23). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II. FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 11–23):

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on June 12, 2018 (ECF No. 10). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

(1)     Plaintiff meets the insured status requirements of the Act through December 31, 2019[2];

(2)     Plaintiff has not engaged in substantial gainful activity since April 3, 2015, the amended onset date;

(3)     Plaintiff has the following severe impairments: degenerative disc disease ("DDD"), lumbar spine; lumbar radiculopathy; osteoarthritis; obesity; migraines; benign essential hypertension; hyperlipidemia; diabetes mellitus type II; and unspecified idiopathic peripheral neuropathy/peripheral nerve disease;

(4)     Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(5)     Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b)[3] except she can never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and she can tolerate occasional exposure to unprotected heights, moving mechanical parts, and extreme heat;

---

[2] The time frame relevant to Plaintiff's claim for DIB is April 3, 2015 (date of alleged onset), through March 31, 2017 (date of the ALJ's decision), even though she is insured through 2019.

[3] As set forth in the Regulations:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Case No.: 3:18cv302/EMT

(6)     Plaintiff is capable of performing her past relevant work as an office clerk, pastoral assistant, and receptionist, as this work does not require the performance of work-related activities precluded by Plaintiff's RFC.  Alternatively, after applying the Medical Vocational Guidelines as a framework for decision making, and considering Plaintiff's age, education, work experience, and RFC, as well as the vocational expert's testimony, Plaintiff can  perform other available work that exists in significant numbers in the national economy, including work as a cafeteria attendant, counter attendant, and an information clerk; and

(7)     Plaintiff has not been under a disability, as defined in the Act, from April 3, 2015, through the date of the decision.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied,

the Commissioner's decision will not be disturbed if in light of the record as a whole

the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g);

Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote

v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a

scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person

would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S.

389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison

Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125

F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or

substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d

1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates

against the Commissioner's decision, the decision must be affirmed if supported by

substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

     The Act defines a disability as an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify

as a disability the physical or mental impairment must be so severe that the claimant

is not only unable to do her previous work, "but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

### A.  Relevant Personal and Employment History

Plaintiff was fifty-two years of age on February 22, 2017, the date of her hearing before the ALJ (tr. 49–50). She weighed 250 pounds and stood at five feet, four inches tall (tr. 50). She had completed the twelfth grade and obtained a Certified Nursing Assistant Certificate ("CNA") (tr. 51). She last worked in October 2014 as an office manager for a church where her duties included filing, answering phones, and performing computerized bookkeeping services such as payroll (*see id.*). She

testified that she also sang, taught choir, and played piano, and she noted that she never lifted anything that weighed more than a box of paper (tr. 51–52). Plaintiff quit this employment due to issues with "sitting up all day" and "awful" migraines, as well as a controversy within the church (tr. 52). She noted that on some days in this job she could barely function and had to "stop work or go home" (tr. 55).

Prior to this employment, Plaintiff worked full-time as a praise and worship leader for about seven years (tr. 52). Her duties included gathering songs for worship and lifting props for seasonal church plays (tr. 52–53). She also previously worked as a receptionist in an attorney's office where she scheduled appointments, answered the phone, and filed documents (tr. 53). She could not remember how much she was required to lift in this position, but she recalled that she shopped for groceries and carried miscellaneous supplies to the office, including drinks (*id*.).

Plaintiff testified she is unable to work due to "pain" from her "head to [her] toes" which has been ongoing for "years" (tr. 54). She also noted she suffers from migraine headaches and has pain in her back, feet, shoulders and arms, which she believes stems from her neuropathy or fibromyalgia (tr. 55, 67).

Continuing, Plaintiff testified that she plays piano by ear on some Sundays for about ten minutes, but it causes pain (tr. 58–59). She stated she is unable to play for an hour (tr. 67). She claimed to also have trouble writing due to pain and stated she cannot lift more than a gallon of milk (and must do so without using her thumb) (tr.

67, 69–70). Plaintiff testified that she does not sleep at night and sleeps very little during the day, so she is often groggy and tired (tr. 60). She rated her usual daily pain at an eight to nine out of ten, even when she is taking ibuprofen and Norco, "[a]nd that's without [taking into account] the migraines" (tr. 75). Plaintiff stated her migraines occur two to three times per week and "stop [her] in [her] tracks" (tr. 62). She takes BC Powders when she has migraines, but she usually ends up in bed "throwing up" and then is "out of commission . . . [a]bout all day" (*id*.). As for her diabetic neuropathy, Plaintiff testified that she feels "very painful" stinging, burning, and "sometimes numbness" in her feet, arms, and legs (tr. 64–65). She stated she cannot afford to get a "nerve test" and that her doctor sees her on a courtesy basis (tr. 65).

Plaintiff testified that she takes Celexa for depression and believes that her psychological problems stem from her chronic physical pain (tr. 66). She also stated she has trouble with her memory, such as forgetting dates, what she ate the day prior, and words to church hymns (tr. 67–68). As for concentration, Plaintiff testified that due to pain, she would not be able to keep her mind on a job for eight hours (tr. 74).

Plaintiff referenced a medical record during the hearing (tr. 357) and confirmed that she takes Metformin, Lisinopril, Norvase, Tanzeum, Celexa, Amaryl, Norco, and ibuprofen, as well as the BC Powders for her migraines as previously mentioned (tr.

56). She testified that she would take Neurontin or Gabapentin if she could afford it, although she could not recall how much it costs (tr. 56–57).

Plaintiff testified that she is able to set up her husband's nebulizers, occasionally drive, go to the grocery store once a month, and do some housework, but that her daughter helps with heavier household chores such as vacuuming and doing the laundry because it "hurts to bend over" (tr. 51, 61, 70). She testified her family generally eats sandwiches because she is unable to "stand for long periods of time" and cook (tr. 61, 71). For exercise, Plaintiff walks to and from a fish pond behind her house, but she noted that she then "ha[s] to stop" (tr. 61). Plaintiff also testified that she sits in a recliner for most of the day in an upright position but has to change positions "nonstop" because of pain (tr. 71–72). She felt she would not be able to perform a receptionist job because it "hurts" to sit all day (tr. 72). She further alleged she cannot not stand or "walk and stand" for six hours a day (tr. 74).

Plaintiff's husband, Jimmy Page, also testified at the hearing. He stated that for the past year he had observed problems regarding Plaintiff's memory (tr. 78–79). He stated, for example, that she forgets what she needs to buy at the grocery store, that she is always writing reminders on her hands, that she will sometimes ask him "four times" as to whether she had administered his morning medication, and that she consistently forgets whether or not she fed the fish in the pond (*id*).

B.     Relevant Medical History

Evidence that Predates the Alleged Disability Onset Date

An October 8, 2003, MRI revealed DDD at the "bottom three lumbar levels" and mild to moderate L4 root foraminal stenosis bilaterally (tr. 328).

On August 20, 2014, Plaintiff was seen by Advanced Registered Nurse Practitioner ("ARNP") Jessica Ludwig, with the office of James W. Howell, D.O. (tr. 287).  Plaintiff complained of high blood pressure but denied being fatigued or experiencing anxiety or depression (tr. 287–88).  Plaintiff did report chronic headaches but stated that BC Powder relieved the pain (tr. 288).  An examination of her neck and spine was "normal," as was her gait (*id*.).  She was prescribed Clonidine and advised to follow up in two weeks (*id*.).

On March 12, 2015, Plaintiff presented to Maria Tedtaotao, M.D., to establish care (tr. 295).  Plaintiff reported fatigue, joint pain, muscle pain, neck pain, back pain, difficulty walking, headaches, weakness and numbness/tingling in her extremities, depression, and stress (*id*.).  Plaintiff reported that her low back pain started after a man fell on top of her about fifteen years earlier when she was working in a nursing home as a CNA (*id*.).  She claims she was assessed with "bulging discs" and "nerve damage" and stated that she began going to physical therapy and taking Lortab, but the back pain never improved and instead got worse, rendering her unable to work (tr.

295–96).  She also claimed to have pain from her head to her feet and in her arms, as well as neuropathy from her diabetes and migraines, all of which had contributed to her inability to work (tr. 296).  Dr. Tedtaotao found Plaintiff to have full range of motion ("ROM") in all extremities, decreased ROM in her lumbar spine due to pain, paraspinal spasms in the lumbar spine, decreased bilateral lower extremity strength due to lower back pain, and bilateral lower extremity paresthesia (*id.*).  Dr. Tedtaotao assessed lumbago, low back pain, osteoarthritis, migraines, depressive disorder, obesity, hypertension, diabetes mellitus type II ("DM Type II"), unspecified idiopathic peripheral neuropathy, and peripheral nerve disease (*id.*), and she prescribed Metformin, lisinopril, Amaryl, Hydralazine, Celexa, and diclofenac (tr. 297).

An x-ray of the cervical spine was obtained on March 12, 2015, the results of which were unremarkable (tr. 298).  An x-ray of the lumbar spine from the same day revealed facet degenerative changes in the lower lumbar spine (tr. 299).

<u>Evidence from the Relevant Period (April 3, 2015, to March 31, 2017)</u>

Plaintiff continued to see Dr. Tedtaotao, including on April 3 and 24, 2015, October 22, 2015, November 19, 2015, February 18, 2016, May 16, 2016, August 15, 2016, September 19, 2016, and November 14, 2016 (*see* tr. 293, 379, 370, 368, 366, 364, 361, 359, 356).  At these visits Plaintiff reported back pain, difficulty walking, weakness, numbness, and tingling (*id.*).  Additionally, Plaintiff usually complained

of worsening pain, and she often requested increased or different medication to help alleviate her symptoms (tr. 379, 376, 370, 368, 359, 356). Throughout these visits, Dr. Tedtaotao found full ROM of all extremities and intact strength of the bilateral extremities (although sometimes noted at "5-/5" (*see* tr. 377, 368, 362)), but decreased ROM of the lumbar spine, paraspinal spasms, and sometimes paresthesia, which was usually noted in the bilateral lower extremities (tr. 379, 368, 365, 362, 359, 357, 293). Plaintiff was always observed to have a steady gait (tr. 388, 382, 380, 377, 371, 368, 367, 365, 362, 359, 357).

Dr. Tedtaotao consistently diagnosed Plaintiff with low back pain, obesity, hypertension, and DM Type II, and more recent records reveal diagnoses of a neurological disorder and/or peripheral neuropathy related to her DM Type II in addition to radiculopathy (tr. 382, 380, 371, 369, 367, 365, 362, 360). Dr. Tedtaotao noted that Plaintiff reported she had previously been diagnosed with fibromyalgia, but the undersigned has found no such diagnosis in the record, including in Dr. Tedtaotao's records (tr. 379, 359). Barbara Jablanski (believed to be a Physician's Assistant), with Dr. Tedtaotao's office, offered diagnoses of myalgia, myositis, and fibromyositis (not fibromyalgia) during a August 2015 visit (tr. 377). Although on April 3, 2015 (Plaintiff's alleged onset date), Dr. Tedtaotao stated that Plaintiff was "definitely" unable to work (tr. 294), she subsequently encouraged Plaintiff to

exercise on repeated occasions (*see, e.g.*, tr. 371 (Oct. 2015), 367 (Feb. 2016), 365 (May 2016)).

Plaintiff was seen by several other providers during the relevant period, including ARNP Donna Porter with the Washington County Health Department ("WCHD"), who examined Plaintiff on July 15, 2016 (tr. 336). ARNP Porter noted full ROM of all extremities, full ("5/5") strength in all extremities, and no abnormalities or swelling (tr. 338). On November 4, 2016, Plaintiff saw ARNP Glen Nobles, also with the WCHD, and reported back pain from the neck down that was worse in her lower back and down her legs (tr. 333). She complained of right thumb stiffness, pain and stiffness in her neck and back, and tenderness to her SI joints bilaterally (tr. 333–34). She rated her pain at an 8/10 (tr. 334). She was given an anti-inflammatory injection and proscribed naproxen and cyclobenzaprine (tr. 334–35).

The last treatment records from Dr. Tedtaotao are from office visits in November of 2016. At the first visit, on November 14, 2016, Plaintiff reported joint pain, muscle pain, back pain, difficulty walking, weakness in extremities, numbness, and tingling (tr. 356). Plaintiff also claimed that she was having more lower back pain, that it was going into her lower extremities more than usual, and that her neck and shoulders were hurting (*id*.). She stated she could not exercise due to her pain, "fibromyalgia," and neuropathy (*id*.). She claimed she could not stand or walk too

long and had to rest "a lot" with her feet up (*id.*). Dr. Tedtaotao noted decreased ROM of the lumbar spine area, paraspinal spasms, tenderness, bilateral lower-extremity strength at 4+/5, paresthesia of the feet, and a steady gait (tr. 357). She assessed low back pain, obesity, DM Type II, neurological disorder associated with DM Type II, essential hypertension, and lumbar radiculopathy (*id.*). She prescribed Norco, and maintained prescriptions for Mobic, Metformin, lisinopril, Norvasc, Celexa, Amaryl, and ibuprofen (*id.*). At the second visit, on November 17, a steroid injection was administered for Plaintiff's back pain, because Plaintiff reported that a previous injection had helped to improve the pain (*see* tr. 355–56).

A November 28, 2016, MRI of the lumbar spine revealed mild disc degeneration at L4-5 with a disc bulge that just contacted the thecal sac, moderate facet degeneration, worse on the right, and very slight spondylolisthesis (tr. 326). It also revealed mild disc degeneration L3-4, a posterior bulge that just contacted the thecal sac, and mild foraminal narrowing that did not deform the roots (*id.*). A few other "[l]ess significant abnormalities" were noted but not included in the "Impression" section of the radiologist's report (*id.*).

With respect to her mental health conditions, Dr. Tedtaotao had previously diagnosed Plaintiff with depressive disorder and generalized anxiety disorder (tr. 382, 380, 371, 367, 365). In April of 2015, Plaintiff reported that Celexa was helping her

depression and anxiety "a lot" (tr. 293). In August of 2015, she reported the Celexa was still helping her depression, but she was experiencing anxiety (tr. 376). At the visit on November 14, 2016, Plaintiff denied nervousness, depression, sleep problems, and stress, and Dr. Tedtaotao noted her mood and affect were normal and that her memory, judgment, and insight were intact (tr. 356–57).

C.      Other Information Within Plaintiff's Claim File

On May 19, 2012, Plaintiff presented to Galina Kats-Kagan, M.D., with the Defuniak Springs Walk-In Clinic, for a consultative examination (tr. 270). She complained of diabetes, neuropathy, back pain, stomach muscle problems, and a failing bladder (*id*.). She also reported a history of pain in her joints and stomach, as well as anxiety (*id*.). Plaintiff additionally advised Dr. Kats-Kagan of her frequent migraines and stated she has had them since the age of twelve, with the last one occurring about a week prior (*id*.). Plaintiff reported stiffness and frequent backaches, as well as numbness and weakness in her feet but not in her hands, and she stated that due to all of her "problems" she felt she could not work (tr. 270–71). Plaintiff advised she was taking Byetta, Tradjenta, Nexcontin, ibuprofen, Alpeazea, Diavan, Reglan, and Relpax, which evidently had been prescribed by her primary care physician (*see* tr. 270). A physical examination was largely unremarkable and revealed no

abnormalities with respect to Plaintiff's gait, back, extremities, ROM, grip strength, fine manipulation abilities, motor function, or mental status (tr. 271–72).

On May 21, 2012, Plaintiff was seen by Julian A. Salinas, Ph.D., for a consultative evaluation (tr. 278). She reported persistent worry, stress, anxiety, fearfulness, suicidal ideation, sad mood, loss of interest in pleasurable activity, periods of hopelessness and helplessness, disturbance of sleep, tearfulness, memory and concentration problems, depression, and binge eating (tr. 279). She claimed to have been provided "sample" psychotropic medications by her primary care physician, but she could not recall the name of the medications or produce a container for Dr. Salinas to review (*id.*). She was assessed with adjustment disorder with mixed anxiety and depressed mood; depressive disorder, not otherwise specified ("NOS"); an eating disorder, NOS; and a GAF of 56[5] (tr. 280). Dr. Salinas felt she would benefit from cognitive behavioral psychotherapy (tr. 281).

On May 5, 2015, a non-examining agency psychologist, John Thibodeau, Ph.D., assessed Plaintiff's mental conditions (tr. 92–94). He found her to have an affective

---

[5] Global assessment of functioning, or GAF, is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

disorder and an anxiety-related disorder (tr. 93). He opined that these conditions caused a mild restriction in activities of daily living, a mild difficulty in maintaining social functioning, and a mild difficulty in maintaining concentration, persistence or pace (*id*.). He found that Plaintiff had not experienced repeated episodes of decompensation of extended duration (*id*.). On June 15, 2015, a second non-examining agency psychologist, Keith Bauer, Ph.D, assessed Plaintiff's mental conditions (tr. 106–07). His findings are identical to those of Dr. Thibodeau (*id*.).

On June 29, 2015, a non-examining agency physician, Larry Meade, D.O., assessed Plaintiff's physical capabilities (tr. 108–10). He opined that Plaintiff was capable performing the full range of light work, and he assessed no postural, manipulative, visual, communicative, or environmental limitations (*see* tr. 109).

Plaintiff was evaluated by one-time consultative examiner Kenneth Long, Ph.D., on January 12, 2017 (tr. 345). She reported depressed mood, anxiety, sleep disturbance, chronic pain, decreased social interaction, and loss of motivation (tr. 350). Dr. Long administered the Wechsler Memory Scale (WMS-IV) as part of his assessment and found Plaintiff's auditory memory and visual working memory to be in the borderline range; her visual memory, immediate memory, and delayed memory to be in the extremely low range; and her delayed memory performance to be in the average range (tr. 348–50). Plaintiff was diagnosed with unspecified depressive

disorder (tr. 350). On a Medical Source Statement, Dr. Long opined that Plaintiff's impairment does not affect her ability to: understand, remember, and carry out instructions; interact appropriately with supervisors, co-workers, and the public; or respond to changes in a routine work setting (tr. 351–53). Moreover, despite finding "moderate" barriers to employment, he encouraged Plaintiff to seek employment consistent with her previous training and work experience, upon her physician's approval (tr. 350).[6]

Plaintiff completed a supplemental pain questionnaire on April 6, 2015 (tr. 220–22). She reported numbness in her hands and fingers, as well as "severe" low back pain that radiated into her legs and feet, which she described as "throbbing" and as feeling like "needles" in her feet (tr. 220). She also reported "severe" and "very painful" migraines that occurred two to three times per week and caused her to become nauseous and to vomit (*id*.). She claimed that the migraines required her to lie down in a dark room and that some attacks lasted three to four days (*id*.). She stated that if she takes BC Powder early enough, it can help with a migraine (tr. 221). She stated that sitting, walking, standing, bending, lifting, and cold caused pain in her

---

[6] Plaintiff's sister (Glenda Hammick) and daughter (Hannah Lewis) both completed a third-party questionnaire on April 2, 2015 (tr. 214–16; tr. 219–20). Additionally, Plaintiff's former employer at New Beginnings Church, Nichole Taunton, submitted a statement on December 21, 2016 (tr. 265–66). But because Plaintiff has not raised any claims related to these statements, they are not summarized herein.

hands, feet, and legs (tr. 220). She also reported diabetes, high blood pressure, neuropathy, and depression (*id.*). Plaintiff claimed to "always" have pain in her back, hands, and feet, for which she could not obtain relief (tr. 221). She reported taking Diclofenac twice daily, Aleve, and Lortab, but stated that these medications do not "help much" and cause nausea and anxiety (*id.*). She also reported that prior physical therapy had not helped and that her TENS unit only "work[ed]" for a few minutes (*id.*). She claimed she could cook small meals, attend to her personal care, and do a "little" housecleaning, but could not assist with laundry, shop, drive, or do yard work, hobbies, child care, or home maintenance (tr. 221–22). She reported she could sit for only a short time, that it hurt to stand and walk, and that pain interfered with her sleep (tr. 221–22). Lastly, Plaintiff reported she was depressed due to "loss of doing for [her]self" (tr. 222).

Finally, Vocational Expert ("VE") William Thompson testified at Plaintiff's hearing (tr. 80). He classified Plaintiff's past work as an office clerk as light, semi-skilled work; as a pastoral assistant as light, skilled work; and as a receptionist as sedentary, semi-skilled work (*id.*). He then testified that a hypothetical person who could perform the full range of light work, would be able to perform Plaintiff's past relevant work, as could a person with Plaintiff's RFC (i.e., light work but with additional postural and environmental restrictions) (tr. 81). According to the VE, a

person with Plaintiff's RFC could also perform other work in the national economy such as a cafeteria attendant (light, unskilled), counter attendant (light, unskilled), and information clerk (light, unskilled) (tr. 82–83). The VE then testified that a hypothetical person with Plaintiff's RFC, but who was limited to sedentary work, could still perform Plaintiff's past work as a receptionist (tr. 83).

Next, the VE testified that if the hypothetical person would also be absent from work at least two days per month, the person would not be able to perform Plaintiff's past work or any other work in the national economy "at a competitive level . . . [t]hey would require an accommodation" (tr. 85). Lastly, the VE opined that if the hypothetical person described above who is limited to sedentary work (i.e., the one who could perform Plaintiff's past work as a receptionist only), was not absent two days per month but was limited to performing simple and routine tasks, the person could not perform any of Plaintiff's past work (*id*.).

V.   DISCUSSION

Plaintiff raises three issues in this appeal. She contends: (1) the ALJ erred at step two of the sequential evaluation in failing to find that she had a severe memory impairment; (2) the ALJ erred in evaluating her subjective complaints of pain; and (3) the ALJ erred in determining her RFC.

A.   Step Two Findings

At step two of the sequential evaluation process, a claimant must prove that she is suffering from a severe impairment or combination of impairments, that have lasted (or must be expected to last) for a continuous period of at least twelve months, and which significantly limit her physical or mental ability to perform "basic work activities." *See* 20 C.F.R. §§ 404.1509, 404.1520(c) 404.1521(a). Basic work activities include mental functions such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervisors, co-workers, and usual work situations; and dealing with changes in a routine work setting, as well as physical functions not at issue here. 20 C.F.R. § 404.1521(b). An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account"). Although the claimant carries the burden at step two, the burden is mild. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Step two is a

threshold inquiry. It allows only claims based on the most trivial impairments to be rejected."). A claimant need only show that "her impairment is not so slight and its effect is not so minimal." *Id.*

In evaluating the severity of mental impairments, the ALJ must follow a "special technique," which requires that the ALJ first evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a. If so, the ALJ must then rate the degree of functional limitation resulting from the impairment(s) in four broad functional areas, namely: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing onself. *Id.* The ALJ must rate the degree of limitation in each of these areas on a five-point scale, using the following terms: none, mild, moderate, marked, or extreme. If a claimant has no more than mild functional limitations, the ALJ "will generally conclude that [the claimant's] impairment(s) is not severe . . . ." *Id.*

Here, the ALJ determined that Plaintiff had the following medically determinable mental impairments: depressive disorder, generalized anxiety disorder, adjustment disorder, and eating disorder (tr. 13). Applying the special technique, the

ALJ next found that Plaintiff had only "mild" limitations in each of the four functional areas and thus no severe mental impairment (tr. 13–14).

Plaintiff contends the ALJ erred because he "erroneously found that [Plaintiff] did not have a severe memory impairment" (ECF No. 15 at 1, 6). In support, Plaintiff primarily points to those portions of Dr. Long's memory testing which revealed "extremely" low functioning in certain areas. Plaintiff contends the ALJ erred in assigning only "partial weight" to Dr. Long's memory test results and generally contends that those results are consistent with other evidence of record.

First, Plaintiff has produced no evidence of a "memory impairment" diagnosis (Plaintiff premises this claim on Dr. Long's findings, but he assessed only "Unspecified Depressive Disorder (*by history*)" (*see* tr. 350), and no other "memory impairment" diagnosis exists in the record). A claimant bears the burden of proving her disability, so she is responsible for producing evidence to support her claim. *See, e.g.*, Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam). More importantly, there is no medically determinable impairment known as a "memory impairment" which the ALJ *could have* found severe at step two. The Listings address only the following nine categories of mental impairments: organic mental disorders; schizophrenic, paranoid, and other psychotic disorders; affective disorders; intellectual disability; anxiety-related disorders; somatoform disorders; personality

disorders; substance addiction disorders; and autistic disorders and other pervasive developmental disorders. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.02–12.10. "Memory impairment" is not a disorder included within any of these categories, and thus Plaintiff's argument is unclear.

To the extent Plaintiff contends that the ALJ erred in failing to find that she has moderate (or greater) limitations in any of the four functional areas and, correspondingly, erred in failing to find one or more of her medically determinable mental impairments to be severe, her argument fails. An ALJ is not required to identify, at step two, *all* of the impairments that should be considered severe. Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 824 (11th Cir. 2010). "Instead, at step three, the ALJ is required to demonstrate that [he] has considered all of the claimant's impairments, whether severe or not, in combination." *Id*. (citing Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir.1987) ("the finding of *any* severe impairment . . . whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" is enough to satisfy step two) (emphasis added)); Bowen v. Heckler, 748 F.2d 629, 635 (11th Cir. 1984) (explaining that the ALJ must make "specific and well-articulated findings as to the effect of the combination of impairments")). Here, the ALJ found several of Plaintiff's mental impairments to be severe at step two, and then—at step three and in determining Plaintiff's RFC—he

made clear that he had considered the "entire record," the "combined effects" of all Plaintiff's "medically determinable impairments," and "all symptoms" to the extent they were consistent with other evidence in the record (*see* tr. 16–17). *See* <u>Nichols v. Comm'r, Soc. Sec.</u>, 679 F. App'x 792, 797 (11th Cir. 2017) (rejecting argument that an ALJ did not consider a claimant's combined effect of impairments where the ALJ stated that he considered impairments in combination and that he considered the entire record, all symptoms, and the extent to which those symptoms were consistent with the evidence). The ALJ ultimately made a "not disabled" decision at step four based on Plaintiff's RFC and corresponding ability to perform her past relevant work, and he made an alternative finding of "not disabled" at step five. For all these reasons, any error at step two is harmless.

Additionally, to the extent Plaintiff asserts that the ALJ erred by discounting some of Dr. Long's findings, again the court finds no error. In concluding that Plaintiff had "mild" memory difficulties, the ALJ pointed to Plaintiff's reported activities of daily living such as her ability to drive, shop, prepare meals, play the piano at church, and meet her own self-care needs, as well as Plaintiff's statement of November 2016 that she was "recently having to care for elderly parents" (tr. 18, 334). The ALJ also pointed to those parts of Dr. Long's examination which revealed normal or essentially normal results (*see* tr. 19 (*e.g.*, finding immediate and delayed

recall to be intact)). Moreover, Dr. Long specifically recommended that Plaintiff should seek employment in her previous line of work (tr. 350). The ALJ also referenced the opinions of both Dr. Thibodeau and Dr. Bauer who found at most only "mild" difficulties in all areas of mental functioning (tr. 20, 93, 106–07). And Dr. Tedtaotao noted in November 2016 that Plaintiff's memory was "intact" (tr. 357).[7]

Continuing, the ALJ noted that Dr. Long opined on a Medical Source Statement form, completed in connection with his evaluation of Plaintiff, that she had *no* deficits in her ability to remember and carry out instructions (*see* tr. 19, 351). Although this opinion appears to conflict with some of Dr. Long's memory test results, the ALJ correctly observed that Dr. Long failed to reconcile the discrepancy between the opinion and the results, and for that reason the ALJ assigned only partial weight to the extreme memory testing results, noting that they were inconsistent with other parts of the record (*see* tr. 20), including Dr. Long's own Medical Source Statement.

Plaintiff additionally contends the ALJ erred by not considering *all* of the things she forgot during her hearing testimony, such as the basic details of her past job duties and the cost of a medication she had discontinued. Plaintiff is not entitled to relief on this basis. The question for this court is whether the ALJ considered Plaintiff's

---

[7] It bears noting that although the statement submitted by Nichole Taunton (Plaintiff's former employer) includes significant detail regarding Plaintiff's *physical* limitations, it identifies no limitations regarding Plaintiff's mental functioning, such as deficits in memory or concentration (tr. 265–66).

condition as a whole and based his decision on substantial evidence, not whether the ALJ discussed each and every piece of evidence. *See* <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," as long as the ALJ's decision "is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'") (quoting <u>Foote</u>, 67 F.3d at 1561); *see also* <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (ALJ must sufficiently explain the weight given to "obviously probative" evidence). Here, the ALJ did consider Plaintiff's mental (and physical) condition(s) as a whole. Moreover, the few "things Plaintiff forgot during her hearing testimony" do not constitute "obviously probative" evidence of Plaintiff's condition.

After considering Plaintiff's condition as a whole, the ALJ concluded that she had "mild" memory deficits and ultimately an ability to return to her past work or, alternatively (at step five), to perform other available *unskilled* work (*see* 20 C.F.R. § 404.1568(a)) (unskilled work is work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time); SSR 96-9p, 1996 WL 374185, at *9 (unskilled work involves understanding, remembering, and carrying out *simple* instructions; making *simple* work-related decisions; and dealing with changes

in a *routine* work setting.)). The ALJ's conclusions are supported by substantial evidence in the record as a whole. Thus, the ALJ committed no error at step two.

B. Subjective Complaints of Pain and Other Symptoms

Plaintiff contends that the ALJ erroneously rejected her subjective complaints of disabling pain and limitations.

When a claimant attempts to establish disability through her own testimony about her pain or other subjective symptoms, a two-part "pain standard" applies. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The pain standard requires the claimant to show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise" to the claimed symptoms. Wilson, 284 F.3d at 1225; *see also* 20 C.F.R. § 404.1529(a)–(b). If the ALJ determines that the claimant has a medically determinable impairment that could reasonably produce the claimant's pain or other symptoms, then the ALJ evaluates the extent to which the intensity and persistence of those symptoms limit the claimant's ability to work. 20 C.F.R. § 404.1529(b)–(c). At this stage, the ALJ considers the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by medical sources, and

other evidence of how the pain affects the claimant's daily activities and ability to work. *Id*. § 404.1529(c).

An ALJ must "articulate explicit and adequate reasons" for discrediting a claimant's allegations of completely disabling symptoms. <u>Foote</u>, 67 F.3d at 1561–62. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court." *Id*., 67 F.3d at 1562 (quoting <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983)). The ALJ's determination does not need to cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection of a claimant's allegations which is "'not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'" <u>Foote</u>, 67 F.3d at 1561 (quoting <u>Jamison v. Bowen</u>, 814 F.2d 585, 588–90 (11th Cir. 1987)); *see also* <u>Dyer v. Barnhart</u>, 395 F.3d 1206 (11th Cir. 2005) (same).

Although an ALJ is permitted to discredit a claimant's subjective testimony of pain and other symptoms, the ALJ should consider that symptoms can vary over time. Under Social Security Ruling ("SSR") 16-3p:

> If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, we will determine that an individual's symptoms are more likely to reduce his or her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner. However, inconsistencies in an individual's statements made at varying times does not necessarily mean they are

inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.

SSR 16-3p (eff. Mar. 28, 2016).[8]

Here, the ALJ generally concluded that while Plaintiff's impairments would reasonably be expected to cause the alleged symptoms, her allegations regarding the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the evidence of record (tr. 17). In so concluding, the ALJ pointed to

---

[8] SSR 16-3p rescinded SSR 96-7p, which provided guidance on how to evaluate the credibility of a claimant's statements about subjective symptoms like pain. *See* SSR 16-3p, 81 Fed. Reg. 14166, 14167 (March 9, 2016); SSR 96-7p, 61 Fed. Reg. 34,483 (June 7, 1996). The new ruling eliminated the use of the term "credibility" in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will "not assess an individual's overall character or truthfulness" but instead will "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. . . ." SSR 16-3p, 81 Fed. Reg. 14166, 14171. Under SSR 16-3p, adjudicators will continue to consider whether the "individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record." *Id*. at 14170.

To be sure, "SSR 16-3p provides clarification of the subjective pain standard; it does not substantively change the standard." Harris v. Berryhill, No. 5:16-cv-01050-MHH, 2017 WL 4222611, at *3 n.2 (N.D. Ala. Sept. 22, 2017); *see also* Griffin v. Berryhill, No. 4:15-cv-0974-JEO, 2017 WL 1164889, at *6 n.10 (N.D. Ala. March 29, 2017) ("The Eleventh Circuit's pain standard is consistent with the parameters that SSR 16-3p set forth."). There is a October 25, 2017, version of SSR 16-3p, which supersedes the March 16, 2016, version, only in order to address the applicable date of the ruling and its retroactivity. 2017 WL 5180304, at *13 n.27. The versions are materially the same in all other respects. *Compare* 2017 WL 5180304, *with* 2016 WL 1119029. Nevertheless, the court cites the March 2016 version here, because the ALJ's decision issued on March 31, 2017. *See, e.g.*, Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1308 (11th Cir. 2018) (finding that SSR 16-3p applies only prospectively).

various portions of the record, including: (1) an October 2003 MRI which found DDD and mild to moderate forminal stenosis bilaterally but no instability, significant disc fragmentation, large disc herniation, or focal process (tr. 328); (2) an August 2014 visit with ARNP Ludwig where Plaintiff stated BC Powder relieves her headaches (tr. 288); (3) a March 2015 x-ray of the lumbar spine which showed facet degenerative changes in the lower lumbar spine (tr. 299); (4) a March 2015 x-ray of the cervical spine which was unremarkable (tr. 298); (5) treatment notes made in 2015 and 2016 from Dr. Tedtaotao which found "steady gait, strength intact . . . and pain with paraspinal spasms, but no disabling conditions" (*see generally* tr. 355–92); (6) a July 2016 examination which revealed a full ROM in all extremities, 5/5 muscle strength in all extremities, and no joint abnormalities (tr. 338); (7) a September 2016 examination where Plaintiff was noted to have decreased ROM and paraspinal spasms in her lumbar spine, and paresthesia of her feet, but her gait was found to be steady and her strength "intact" (noted to be "5-/5" in the bilateral lower extremities) despite complaints of "difficulty walking" and "severe back pain" (tr. 359); (8) the results of a lumbar spine MRI of November 28, 2016, detailed *supra* (tr. 326); (9) Plaintiff's ability to care for her elderly parents (tr. 334); (10) various medical opinions of record; and (11) Plaintiff's activities of daily living (*see* tr. 14–21).

The ALJ did not err in identifying the foregoing portions of the record as inconsistent with Plaintiff's complaints of extreme and disabling pain and other symptoms. *See* 20 C.F.R. § 404.1529(a) (an ALJ is permitted to consider the "extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence . . . ."); SSR 16-3p (eff. Mar. 28, 2016) (adjudicators will consider whether the "individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record"). Plaintiff is correct in asserting that an ALJ may not evaluate a claimant's testimony regarding her symptoms and limitations based *only* upon a lack of objective evidence to fully substantiate such testimony, but here, the ALJ relied on objective evidence *in addition to* other evidence that is inconsistent with Plaintiff's subjective complaints. There is no error, as the ALJ's considerations were appropriate and supported by the evidence of record.[9]

C.     Residual Functional Capacity Determination

---

[9] The ALJ's decision stands on its own, and may be affirmed on its own, but the court notes that its own review of the record revealed additional factors that undermine Plaintiff's complaints of disabling symptoms. First, as noted above, treating physician Tedtaotao repeatedly advised Plaintiff to exercise (*see, e.g.*, tr. 365, 367, 371), which suggests that Plaintiff was able to engage in greater physical activities than she described. Second, even though Plaintiff reported that she had suffered from migraines since the age of twelve (tr. 270) and back afflictions since around the year 2000 (tr. 295), she was able to work until October of 2014 (tr. 194).

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments. *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866-7 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

Dr. Meade is the only physician of record who opined that Plaintiff was capable of performing light work. Plaintiff seems to argue that because the ALJ assigned only

"partial weight" to Dr. Meade's opinions, the ALJ must have erroneously based the

"light work" determination on his own lay opinion, as no other opinion evidence as

to "light work" exists in record.  This argument fails because it is based on the

incorrect assumption that an ALJ is required to choose the opinion of a particular

physician to determine a claimant's RFC.  *See* Schmidt v. Apfel, 496 F.3d 833, 845

(7th Cir. 2007) (holding that in determining an RFC, "the ALJ is not required to rely

entirely on a particular physician's opinion or choose between the opinions of the

claimant's physicians").  An ALJ must develop a claimant's RFC based on the entire

record.  As the Tenth Circuit noted:

> [T]here is no requirement in the regulations for a direct correspondence
> between an RFC finding and a specific medical opinion on the functional
> capacity in question.  "[T]he ALJ, not a physician, is charged with
> determining a claimant's RFC from the medical record."  Howard v.
> Barnhart, 379 F.3d 945, 949 (10th Cir. 2004) (following 20 C.F.R.
> § 416.927(e)(2) and SSR 96–59, 1996 WL 374183, at *5); *see also* 20
> C.F.R. §§ 404.1546(c) and 416.946(c).  We have thus "rejected [the]
> argument that there must be specific, affirmative, medical evidence on
> the record as to each requirement of an exertional work level before an
> ALJ can determine RFC within that category."  Howard, 379 F.3d at
> 949; *see, e.g.*, Wall [v. Astrue], 561 F.3d [1048,] 1068–69 [(10th Cir.
> 2009)] (upholding ALJ's findings on mental impairment where record
> did not contain any treating or examining medical opinions as to
> allegedly disabling pain disorder); Bernal v. Bowen, 851 F.2d 297,
> 302–03 (10th Cir. 1988) (holding ALJ properly made mental RFC
> findings without expert medical assistance).

Chapo v. Astrue, 682 F.3d 1285, 1288–89 (10th Cir. 2012) (footnote omitted).  *See*

*also* Nation v. Barnhart, 153 F. App'x 597 (11th Cir. 2005) (unpublished) ("The ALJ

is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is not necessary for an informed decision."); <u>Poke v. Astrue</u>, No. 1:10cv768-CSC, 2012 WL 174472, at *4 & n.10 (M.D. Ala. Jan. 23, 2012) ("[T]he court disagrees to the extent that these cases [from other district courts] suggest that the fourth-step [RFC] determination must be based on a medical source evaluation. . . . <u>Nation</u> does not stand for the proposition that an ALJ must always secure [an RFC] evaluation [or assessment] from a medical source.").

Here, in determining Plaintiff's RFC, the ALJ specifically noted that he considered "the entire record" (tr. 16), which includes many—if not all—of the same eleven factors listed *supra*, which the ALJ referenced in discrediting Plaintiff's subjective complaints (*see* tr. 14–21). This evidence alone provides substantial support for the "light work" classification. Perhaps more importantly, however, the only portion of Dr. Meade's opinion discredited by the ALJ was his finding that Plaintiff was capable of performing the *full range* of light work (tr. 20).[10] Thus, the remaining portion of Dr. Meade's opinion—namely, Plaintiff's capacity for light work—is fully consistent with the ALJ's RFC determination. The only difference is

_____

[10] As previously noted, the ALJ added postural and environmental restrictions to Plaintiff's RFC for light work.

that the ALJ found Plaintiff to be *more limited* than did Dr. Meade. Thus, Plaintiff appears to fault the ALJ for discrediting Dr. Meade's opinions *in a manner that favored her*. Regardless, it is clear to the undersigned that the record contains substantial evidence to support the ALJ's determination that Plaintiff was capable of performing "light work," with the added restrictions he assessed.

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is hereby **ORDERED** that:

1.    The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

2.    **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.    The Clerk is directed to close the file.

At Pensacola, Florida this <u>14</u>th day of May 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**